750 N.W.2d 466 (2008)
2008 ND 107
B.L.L. and G.C., a child, Plaintiffs and Appellees
v.
W.D.C., Defendant and Appellant.
No. 20070324.
Supreme Court of North Dakota.
June 5, 2008.
*468 Anne E. Summers (argued) and Edwin W.F. Dyer III (on brief), Dyer & Summers, P.C., Bismarck, ND, for plaintiffs and appellees.
Justin Jacob Vinje (argued), Bismarck, ND, for defendant and appellant.
CROTHERS, Justice.
[¶ 1] W.D.C. appeals from the district court's order terminating his parental rights. He argues insufficient evidence exists showing abandonment and termination is not in the child's best interests. The district court's order is affirmed.

I
[¶ 2] G.C. was born in September 2005. G.C.'s mother, B.L.L., was sixteen years old when she became pregnant. The child's parents were not married and never lived together. The father was incarcerated during the pregnancy, but was released prior to the birth. The mother continued to reside with her parents after the birth. Accounts differ about the quality of the family's relationship after the child's birth. The mother asserts that the father did not assist in caring for the child and that the father liked the child "just kind of to look at." She further claims the father has not contributed to the care or support of the child. The father admits he has not provided any financial support. He claims he wants to have a relationship with his child, but the mother has denied contact. The father was incarcerated since March 2006 and, at the time of trial, had approximately five months left to serve. He contends he has tried to arrange visits with his child from prison, but the mother has ignored his requests. The mother claims she and the child visited the father in prison approximately five times at the father's request, but the father wanted to see her rather than the child. The mother petitioned for, and received, a protection order against the father because she contends he threatened her in a phone call made from prison. Since the protection order was issued, the mother has not visited the father, and she contends he has not asked to see his child. According to the father, the protection order has made it challenging to maintain a relationship with his son.
[¶ 3] The mother petitioned for termination of the father's parental rights because of his violent behavior, financial irresponsibility and drug use. The parental rights termination hearing was held on September 10, 2007. The district court found the father "made little effort . . . to establish a relationship with the child." The district court found the mother brought the child to visit his father in prison, but the visits ended because she felt the father was verbally abusive. The *469 district court determined the protection order did not prevent the father from sending child support, gifts or presents to his child, but he failed to do so. The district court ascertained the father had abandoned his son and terminated the father's parental rights.
[¶ 4] The father appeals, arguing insufficient evidence exists to support a finding of abandonment and arguing termination is not within the best interests of the child.

II
[¶ 5] Whether a child has been abandoned is a question of fact. In re S.R.F., 2004 ND 150, ¶ 10, 683 N.W.2d 913. "[F]indings of fact in juvenile matters shall not be set aside on appeal unless clearly erroneous." Id. at ¶ 7 (acknowledging an amendment to N.D.R.Civ.P. 52(a) excluding de novo review in juvenile cases). "A finding of fact is not clearly erroneous unless it has no support in the evidence or, although there may be some supporting evidence for it, this court is left with a definite and firm conviction that a mistake has been made." Landsberger v. Landsberger, 364 N.W.2d 918, 920 (N.D.1985).
[¶ 6] Section 27-20-44(1)(a), N.D.C.C., allows termination of parental rights if the parent has abandoned the child. Non-custodial parents are deemed to have abandoned their children if they fail, without justifiable cause, "(1) [t]o communicate with the child; or (2)[t]o provide for the care and support of the child as required by law." N.D.C.C. § 27-20-02(1)(a). See also N.D.C.C. § 14-15-01(1)(a) (indicating an identical definition of "abandon" under the Revised Uniform Adoption Act). This Court has elaborated:
"In determining whether abandonment has taken place, we look to such factors as the parent's contact and communication with the child, the parent's love, care and affection toward the child, and the parent's intent. Also relevant is the parent's acceptance of parental obligations such as providing care, protection, support, education, moral guidance, and a home for the child. A casual display of interest by a parent does not preclude a finding of abandonment, and a parent's negligent failure to perform parental duties is significant to the issue."
In re H.R.W., 2004 ND 216, ¶ 6, 689 N.W.2d 403 (citations omitted). It must be shown the parent possessed "intent to abandon [the child], which may be inferred from a parent's conduct." In re R.M.B., 402 N.W.2d 912, 915 (N.D.1987). "A parent's incarceration is not alone a defense to abandonment, and abandonment may rest upon the parent's confinement coupled with other factors such as parental neglect, absence of contact, failure to support, and disregard for the child's general welfare." In re C.K.H., 458 N.W.2d 303, 305-06 (N.D.1990).
[¶ 7] Here, the district court erroneously based its abandonment determination on N.D.C.C. ch. 14-15, the Revised Uniform Adoption Act. This termination was not pursued in conjunction with an adoption action, so the district court should have decided this case under the Uniform Juvenile Court Act, specifically N.D.C.C. § 27-20-44(1)(a). The definition for abandonment is identical under both Acts, save a presumption created under N.D.C.C. § 14-07-17 that failure to support a child for three months is presumptive evidence of a parent's intention to abandon. The district court did not utilize this presumption so its reference to the Revised Uniform Adoption Act is harmless. See N.D.R.Civ.P. 61 (stating error must be disregarded if it does not affect the substantial rights of the parties).
*470 [¶ 8] The father admits he has not contributed financially to the support of his son, stating, "I've been unable to but I gladly would, yes." He also admits he rarely spent time with his son prior to his incarceration:
Q: Okay. And you saw your son [] for what, about six months of his life?
A: Yes.
Q: And would [the mother] bring him over to the trailer where you were living?
A: If she wasn't upset with me, yes.
Q: And did you ever take care of him yourself when you had him?
A: Yes while she was with her  somebody would come and pick her up and try to keep her out of trouble because she's constantly getting in trouble for assaulting her mother and other girls, so this lady would come up. I think it was called a mentor  so the lady would come and take her out to eat and whatnot and he would sit there with me, yeah.
Q: Then you would have the care of [the child] during that time?
A: Yes  well unless her mother had him. I worked 12, 13 hour days.
Q: And did you ever take [the child] to visit any of your relatives?
A: Usually if I was there, [the mother] was there because I don't have a drivers license.
Q: So you wouldn't take him on your own?
A: No.
Q: But the two of you would take him to visit other relatives?
A: Yes.
The mother also testified the father did not make any effort to be a part of the child's life prior to the father's incarceration. According to the mother, the father never changed a diaper and barely held the child. The mother claims when the father was to care for the child on his own he would pass off the responsibility to other relatives.
[¶ 9] The mother brought the child to see his father approximately five times while the father was incarcerated. The father claims he requested these visits with his child, but the mother testified that while the father expressed an interest in seeing her, bringing the child was her idea. Since the father has been the subject of a protection order preventing contact with the mother, he has not called, written or requested contact with the child. The father claims he tried to arrange a visit with the child through his mother, the child's paternal grandmother. The mother agrees she has spoken with the child's grandmother, but claims the grandmother was not speaking on her son's behalf. Rather, the grandmother wanted to spend time with the child. Even if the father showed a casual interest in seeing his child, H.R.W. cautions that a finding of abandonment may be proper despite "casual display[s] of interest by a parent" and that the significant issue is the "parent's negligent failure to perform parental duties." 2004 ND 216, ¶ 6, 689 N.W.2d 403.
[¶ 10] Our case law also cautions that "imprisonment per se [is] not sufficient to constitute intentional abandonment." In re F.H., 283 N.W.2d 202, 211 (N.D.1979). Imprisonment when combined "with other factors, such as parental neglect and withholding parental affection, lend support to a finding that the parent had relinquished all parental claims to his child and thereby abandoned him." Id. While imprisonment would necessarily interfere with the father's ability to care for the child, the evidence indicates the father *471 made little effort to parent the child, both during and prior to his incarceration. The district court's finding of abandonment is not clearly erroneous because some of the evidence supports the district court's finding and because we are not left with a definite and firm conviction a mistake has been made. See Landsberger, 364 N.W.2d at 920.
[¶ 11] The father also argues termination of his parental rights is not in the best interests of the child. This argument fails because a "best interests of the child" analysis relates to custody determinations. See N.D.C.C. §§ 14-09-05, 14-09-06.1. The "best interests" test has not been used when terminating a parent's rights due to abandonment under N.D.C.C. § 27-20-44.
"A court's consideration of a child's welfare in a termination proceeding, however, must be distinguished from the `best interests of the child' test used primarily in custody proceedings. The `best interest of the child' test involves the weighing of two acceptable alternatives for the rearing of the child. In a termination proceeding, however, the consideration is whether or not the alternative of letting the parent retain his parental rights is acceptable regardless of any competing alternatives. A court makes its determination upon a finding of abandonment, consent, or the parents' continued failure to provide minimum standards of care. Where either of these three circumstances exist, the welfare of the child dictates that the parent's rights be terminated."
F.H., 283 N.W.2d at 213-14 (citations omitted).

III
[¶ 12] B.L.L. has requested an award of attorney's fees under N.D.R.App.P. 38 arguing that this appeal is frivolous. "An appeal is frivolous if it is flagrantly groundless, devoid of merit, or demonstrates persistence in the course of litigation which evidences bad faith." Healy v. Healy, 397 N.W.2d 71, 76 (N.D. 1986). We conclude this appeal is not frivolous; thus we deny the request for attorney's fees.
[¶ 13] B.L.L. also claims sanctions should be awarded under N.D.R.App.P. 13 because a letter W.D.C. sent to B.L.L.'s attorney was abusive. Under N.D.R.App.P. 13, "[t]he supreme court may take appropriate action against any person failing to perform an act required by rule or court order." Rule 13 "is used as an enforcement tool to encourage compliance with the North Dakota Rules of Appellate Procedure." Hanson v. Hanson, 2003 ND 20, ¶ 14, 656 N.W.2d 656. We deny B.L.L.'s request for sanctions because her motion does not establish how the letter has violated the court rules or any court order.

IV
[¶ 14] We conclude the district court's finding of abandonment was not clearly erroneous; therefore we affirm the district court's order.
[¶ 15] VANDE WALLE, C.J., MARING, KAPSNER, and SANDSTROM, JJ., concur.